**CITIZENS FOR JOHN W. MOORE PARTY, et al.,**
**Plaintiffs-Appellants,**

v.

**BOARD OF ELECTION COMMISSION- ERS OF the CITY OF CHICAGO, et al., Defendants-Appellees.**

**No. 85–1012.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1985.

Decided Jan. 13, 1986.

Laura A. Kaster, Jenner & Block, Chicago, Ill., for plaintiffs-appellants.

James M. Scanlon, General Counsel State Bd. of Elections, Chicago, Ill., for defendants-appellees.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

This order constitutes a certification of a question of law to the Supreme Court of Illinois.

Plaintiff John W. Moore was a democratic candidate in the March, 1982, primary election for the office of state senator for the 16th Legislative District. Although Moore and his supporters circulated petitions for his candidacy, he withdrew his name for the state senate nomination one month before the primary. After withdrawing his nomination for the office of state senator, Moore and his supporters decided to form a new political party (Citizens for John W. Moore Party) and to circulate petitions to place Moore on the ballot for the general election in November, 1982, as a candidate for the Illinois House

of Representatives in the 31st House District. To qualify for a place on the ballot, Moore was required to collect 1,500 valid signatures; Moore collected 3,829 signatures.

The Board of Election Commissioners invalidated 1,493 signatures for reasons unrelated to this appeal. 975 signatures were invalidated because Moore had previously circulated nominating petition sheets in the democratic primary. After the signatures were invalidated, Moore was 139 signatures short of qualifying for a place on the ballot.

In invalidating the 975 signatures collected by Moore, the Board relied on Ill.Rev. Stat. ch. 46, § 10-4 (1981), which provides in relevant part: "No person shall circulate or certify petitions for candidates for more than one political party, or for an independent candidate or candidates in addition to one political party, to be voted upon at the next primary or general election." The Board set aside the signatures Moore had collected because the Moore Party was the second party for which Moore had solicited signatures in the 1982 election season (the democratic party was the first party).

Moore filed suit in the Federal District Court arguing that § 10-4 violated the First and Fourteenth Amendments and the Equal Protection Clause of the United States Constitution and was unconstitutionally vague. The district court rejected all of his arguments, 599 F.Supp. 662. As part of the analysis of the First and Fourteenth Amendment claims, the district court found that § 10-4 forwarded three state interests: (1) the state interest in insisting that intra-party competition be settled before the general election to avoid factionalism and party splintering; (2) the state interest in avoiding election abuse; and (3) the state interest in preventing voter confusion. As to the voter confusion interest, the district court wrote:

"The circulator provision is designed to provide stability. Voter confusion can easily occur (here in the same area) as circulators are allowed to switch sides in the same campaign. Abuse or at least confusion can occur if professional circulators serve competing interests espousing divergent views. Just as voters may be limited to nominating one candidate or supporting one party in a primary election, and candidates may be limited to running under the banner of one party, so too are circulators, whose importance to a political party or campaign is significant, limited to campaigning on behalf of one political party or independent candidate in the same election. The circulator restriction provision is a permissible integral part of an overall legislative scheme to regulate elections."

Moore renewed his equal protection, First and Fourteenth Amendment, and vagueness arguments in the United States Court of Appeals. As to the state's interest in preventing voter confusion, the question was raised whether "no person" in § 10-4 applies to signatures gathered by candidates. If the statute does not apply to candidates, the Board acted improperly in invalidating the 975 signatures collected by Moore. If, on the other hand, the statute applies to candidates, questions are raised as to whether the statute serves an important government interest when applied to candidates and whether the statute directly interferes with the candidate's ability to communicate with the voters. Our research has failed to reveal controlling precedent by the Supreme Court of Illinois on the question of whether "no person" in Ill.Rev.Stat. ch. 46, § 10-4 (1981) applies to signatures gathered by candidates. Accordingly, pursuant to Rule 20 of the Illinois Supreme Court Rules (adopted August 30, 1983) this court respectfully requests the Supreme Court of Illinois to provide this court with instructions concerning the following question of law which may be determinative in this case:

Does Ill.Rev.Stat. ch. 46, § 10-4 (1981) apply to signatures gathered by candidates for office?

The Clerk of this court will transmit to the Supreme Court of Illinois a certified copy of this order; a copy of the briefs and

appendix submitted to this court; and, if necessary, the record in this matter.

QUESTION CERTIFIED

EASTERBROOK, Circuit Judge, dissenting.

John Moore ran afoul of a statute providing that "no person shall circulate or certify petitions for candidates of more than one political party ... to be voted upon at the next primary or general election." Ill. Rev.Stat. ch. 46 § 10–4. The court has asked the Supreme Court of Illinois to tell us whether § 10–4 applies to signatures gathered *by* (as well as for) a candidate for office. That court is entitled to express puzzlement at our request. The statute says "no person," and by all accounts Moore is a person.

The order of certification may enable our court to avoid a constitutional question. Courts properly turn somersaults to avoid difficult constitutional issues. Yet there are limits to creative avoidance. For example, a court may not frustrate legitimate applications of a statute in the name of avoiding constitutional issues. *United States v. Riverside Bayview Homes, Inc.,* — U.S. —, —, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985); Henry J. Friendly, *Benchmarks* 207–12 (1967). This case illustrates these limits.

The Board of Election Commissioners of Chicago applied the statute to Moore and disqualified the signatures he gathered in his second try for office, under a second party banner, during the 1982 election season. So far as I can tell, Moore did not argue before the Board that he is not a "person" within the meaning of § 10–4. The Board's application of § 10–4 to Moore is consistent with the construction placed on the statute by the State Board of Elections. A Candidates' Guide, which contains the State Board's advice about the meaning of the statute, draws no distinction between candidates and other circulators.

We have a statute that is clear, applied consistently by the state officials charged with applying it. That makes a sufficient case for treating the statute as meaning what it says. *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980); *Swain v. Pressley,* 430 U.S. 372, 378–79, 97 S.Ct. 1224, 1228–29, 51 L.Ed.2d 411 (1977). Legislative history might cut the other way, but there is no published legislative history in Illinois, and the testimony the district judge received concerning the legislative history did not hint that Illinois drew a distinction between candidates and other people that has so far eluded the state officials charged with enforcing the statute. The decisions of intermediate courts in Illinois also might undermine the clarity of the statute, but none has construed § 10–4.

Moore apparently agrees with the state's construction of this statute. His complaint argues that § 10–4 applies to all persons and is therefore unconstitutional. He did not ask the district court to draw a distinction between candidates and other persons. He did not argue that the state officials have misconstrued the statute. The district court held a full trial, and this issue did not arise; the court's opinion treats this as a constitutional attack on a statute with an agreed meaning. Moore has been consistent. His briefs in this court do not mention the possibility of distinguishing between candidates and other persons. He has not suggested certification; the state has not suggested abstention.

This is not to say that Moore thinks the statute clear; to the contrary he argues that it is unconstitutionally vague. But his arguments are based on different problems. Moore insists that the statute may not apply to dual circulations for major parties, or to circulations for a party and then an independent candidacy. He says that the statute does not necessarily apply to circulation for one party in a primary election and another for the general election. Although Moore is represented by highly skilled counsel who looked at this statute through a microscope, counsel did not find the particular "ambiguity" the ma-

jority sees. Counsel presumed the application of § 10–4 to candidates and used that application as the fulcrum of her attack: for example, "Section 10–4 prohibited Moore from communicating with his constituents by circulating his petitions" (Reply Br. 14). The question whether § 10–4 applies to candidates entered this litigation for the first time in questions posed by the court to counsel at oral argument.

So the Supreme Court of Illinois may wonder why we have asked for its views on the construction of an unambiguous statute that has been consistently applied by the state officials charged with its implementation. I wonder why the court has picked *this* case to certify. We are bombarded with requests to certify to state courts difficult issues of state law. We regularly decline those requests, despite conflicts among intermediate state courts, unless we are persuaded that the question is unusually close and difficult. E.g., *Katapodis v. Koppers Co.*, 770 F.2d 655, 660 (7th Cir. 1985). What about this case calls for certification when other, genuinely difficult, cases are not certified? The majority does not say.

The problem concerns more than prudence in the management of our docket and maintaining good relations with state courts. The difficulties go to our *power* to act as the majority has. We lack jurisdiction to decide this case on a question of state law, and therefore we have no business asking the state court for an advisory opinion. We lack authority to decide this case on a basis that was not presented to the district court. If we have authority we lack reasons. Finally, all these difficulties to one side, we certify the wrong question.

**The problem of jurisdiction.** This is a suit against the State of Illinois. The complaint names the State Board of Elections and its members; Moore ran for state office and needs a judgment that will bind the entire state. The City Board's status is less clear, but it is constituted under state rather than municipal law and enforces state statutes. It is "not a unit of local government" (Ill.Rev.Stat. ch. 46 § 6–21).

Whether an entity is "the state" for purposes of the Eleventh Amendment depends on "the nature of the entity created by state law." *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). *Mt. Healthy* concluded that a school district raising revenue and making choices locally was not part of the state, and other cases hold that counties and other units of local government are not the state. But the City Board is part of a statewide, hierarchial organization of which the State Board is the apex. Local boards administer state law under guidance from the State Board. It is appropriate to treat the City Board as an instrument of the state.

Moore therefore must avoid the Eleventh Amendment, which presumptively bars all litigation in federal courts against the state. *Green v. Mansour*, —— U.S. ——, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *Atascadero State Hospital v. Scanlon*, —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The usual way around this is to name some agents, as Moore has done, and to argue that their acts implementing an unconstitutional statute exceed their authority. See *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), holds that *Young* does not authorize a suit based on a state official's violation of state law. A federal court may order prospective relief based on a violation of the constitution or of federal law, but it may not order state officials to comply with state law. Anyone who wants a judicial order compelling state officials to abide by state law must seek that relief in state court.

Moore wants an injunction against the operation of § 10–4. An order carving candidates out of the scope of § 10–4 would give him partial relief. Under *Pennhurst* we cannot direct state officials to provide that partial relief on the basis of state law.

A construction of a statute by the supreme court of the state would provide a solid foundation for relief, but the Third Circuit in *Pennhurst* relied on a construction of the law by the state court, and the Supreme Court found that this did not grant it authority to act. The fact that the construction of state law has been supplied in the very case under review would not enlarge the federal court's power.

The certification to the Supreme Court of Illinois therefore asks for a construction of state law that would have no use. It could be, at most, the basis of an injunction based on state law, and we lack the authority to issue such an injunction. The state court's answer, if adverse to Moore, would return the case to its current posture and require us to face the merits. An answer favorable to Moore certainly would not be a basis for deciding this suit *against* him. Perhaps state officials, bound by a construction of § 10-4 favorable to Moore (should one be forthcoming), would give him the assurances he seeks that he will not again have signatures rejected on the basis of that statute. But there had been an authoritative construction in *Pennhurst*, and the state's executive officials did not meekly submit.

Sometimes an answer to a question of state law would dissolve the basis of the federal claim and enable the court to dismiss the case. This was so in the two cases involving constitutional questions that the Supreme Court has certified to state courts. See *Elkins v. Moreno*, 435 U.S. 647, 660-62, 98 S.Ct. 1338, 1346-47, 55 L.Ed.2d 614 (1978); *Bellotti v. Baird*, 428 U.S. 132, 146-51, 96 S.Ct. 2857, 2865-68, 49 L.Ed.2d 844 (1976). We cannot be confident, however, that a decision by the Supreme Court of Illinois favorable to Moore would make this case moot. Moore still would want an injunction against the application of § 10-4 to other circulators (he said at oral argument that the statute applied to almost all of his circulators and would have knocked out almost all his signatures had the Board seen fit to rule on signatures other than the ones he gathered). His principal argument is that tiny parties have tiny cadres of loyal circulators, and § 10-4 injures small parties even if candidates may gather signatures for themselves. He would want relief against the application of § 10-4 to candidates as part of this judgment. The Supreme Court of Illinois cannot give him that. A certification requests that court's advice to this court; the *judgment* will be ours. So this case is not going to die a natural death. Moore needs an injunction, and *Pennhurst* prevents him from getting one in federal court on the basis of a construction of state law that disagrees with the construction placed on it by the State Board.

To make matters worse for Moore, even if the City Board is an agent of local government, so that the Eleventh Amendment does not apply, *Pennhurst* holds that principles of comity prevent the issuance of an injunction based on state law that runs against actors outside the Eleventh Amendment, when the principal actors are shielded. 465 U.S. at 123-24, 104 S.Ct. at 920-21. The principal actors here are the State Board and its agents, which (through the Attorney General of Illinois) have assumed the defense of this litigation. My earlier assumption that the City Board is part of the "state" therefore turns out not to be dispositive, and *Pennhurst* bars the way more completely than the Eleventh Amendment does of its own accord.

This is an unhappy result. Courts ordinarily struggle to find ways to avoid resolving constitutional questions; the interpretation of the Eleventh Amendment adopted in *Pennhurst* may force a federal court to reach the constitutional issue even though plausible state-law grounds are available for decision. The case has been criticized with great vigor, both by the four dissenting Justices and by careful scholars. E.g., David P. Currie, *Sovereign Immunity and Suits against Government Officers*, 1984 Sup.Ct.Rev. 149, 164-67; David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case*, 98 Harv.L.Rev. 61 (1984). The majority in *Pennhurst* may not have thought about the interaction between its holding and cer-

tification of questions of state law that has troubled me here, and perhaps my analysis is an extension rather than a simple application of *Pennhurst*. I must accept the law of sovereign immunity as it is, however, and if the logic of a decision compels its extension to a situation not expressly contemplated, a lower court must follow. There is no principled escape from the analysis that produces the dismal conclusion that our court cannot do anything constructive with the advice we have requested from the Supreme Court of Illinois.

**The problem of authority.** Put this all aside, and we still should not certify the case. An appellate court is limited to the issues properly preserved. Moore did not argue before the Board, in the district court, or here, that a candidate for office is not a "person" under § 10–4. This is not an issue naturally subsumed in a constitutional challenge; it is a pendent state claim, a different ground of entitlement to relief.

In a criminal case an appellate court might find a construction of a statute "plain error" and grant relief under Fed.R. Crim.P. 52(b), but there is no "plain error" rule in the rules of civil procedure. In civil cases courts must decide cases as parties present them, and if they neglect to preserve winning issues that is too bad for them. We have abjured—even denounced—the practice of reversing decisions on grounds not preserved by the appellant. E.g., *General Motors Acceptance Corp. v. Central National Bank of Mattoon*, 773 F.2d 771, 778 n. 5 (7th Cir.1985); *Spanish Action Committee v. City of Chicago*, 766 F.2d 315, 319 (7th Cir.1985); *City of Chicago v. Department of Labor*, 753 F.2d 606, 607 n. 1 (7th Cir.1985); *Walker v. Maccabees Mutual Life Insurance Co.*, 753 F.2d 599, 602 (7th Cir.1985); *Parrett v. City of Connersville*, 737 F.2d 690, 698 (7th Cir.1984), *cert. dismissed*, — U.S. —, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985). We have also refused to consider grounds raised belatedly, for example in a reply brief, see *Christmas v. Sanders*, 759 F.2d 1284, 1291–92 (7th Cir.1985); *Beerly v. Department of the Treasury*, 768 F.2d 942, 949 (7th Cir.1985), or raised perfunctorily,

see *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir.1984).

These doctrines augment the litigants' incentive to develop the record and make their points in a timely fashion. If § 10–4 does not apply to candidates the district court has held a pointless trial and wasted much time; so have we. Only a consistent application of the rule barring consideration of new arguments on appeal will preserve the incentive to marshall one's resources for a single, thorough litigation. Cf. *Wainwright v. Sykes*, 433 U.S. 72, 88–90, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977); *Thomas v. Arn*, — U.S. —, —, 106 S.Ct. 466, 468, 88 L.Ed.2d 435 (1985).

Even in a criminal case the first requirement of "plain error" is "error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). The application of the language "no person" to include Moore—an application required by the consistent construction of the statute by responsible state officials—hardly is "plain error" in the criminal law sense. The only time it has undertaken review of a civil judgment for "plain error", the Supreme Court said that the approach is "suited to correcting obvious instances of injustice or misapplied law." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981). Again there is nothing "obviously" wrong with the state agencies' construction of § 10–4.

*Newport* also illustrates the limitations of review of plain error in civil cases. The district court and the court of appeals had considered the merits fully, and the claim of error had been briefed and argued in the Supreme Court. The Court remarked that because the question had been developed thoroughly at all three levels, and the error could be corrected without a new trial or further proceedings, it was appropriate to proceed. 453 U.S. at 256–57 & n. 12, 101 S.Ct. at 2754 & n. 12. It cautioned that its

decision to review the merits did not portend approval of similar decisions by appellate courts, *id.* at 257 n. 16, 101 S.Ct. at 2755 n. 16, see also *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2432 & n. 3, 85 L.Ed.2d 791 (1985), and three Justices found even this limited inroad of plain error review into the civil process unacceptable, *id.,* 453 U.S. at 271–79, 101 S.Ct. at 2762–66 (Brennan, Marshall & Stevens, JJ., dissenting).

The question the majority raises in this case has not been briefed or argued in any court. The parties may have had good reasons for leaving the question alone. For all we know, they could cite to us in an instant a dispositive piece of legislative history showing that "no person" includes candidates. No case the Supreme Court has decided, no case this court has decided, permits a court to inject a new issue into a civil case at this late date. The majority does not justify this novel procedure.

**The problem of reasons:** If there is an error in the construction of § 10–4, the mistake is not "plain." Indeed the majority invites the Supreme Court of Illinois to twist some decently plain language in the statute. Why? A court should avoid constitutional decisions when possible, and a construction of § 10–4 to exclude candidates would enable us to avoid passing on the constitutionality of that portion of § 10–4. The principle of avoidance does not counsel the avoidance of all constitutional issues, however, and it does not require a federal court to send cases routinely to state courts for advice.

This question arises frequently when a statute is unclear, and courts then consider abstaining in favor of litigation in state courts. (Abstention avoids the problem of the Eleventh Amendment, because the state court enters the judgment on the state law ground.) But abstention is an uncommon response to constitutional challenges to statutes. For example, in *Mazanec v. North Judson—San Pierre School Corp.,* 763 F.2d 845 (7th Cir.1985), the court dealt with a statute requiring children in private schools to be given an edu-

cation "equivalent to that given in the public schools." 763 F.2d at 846. Some Jehovah's Witnesses, who wanted to educate their children at home, attacked the statute as an infringement of their religious rights. The interpretation of "equivalent" was a central issue in the suit. Several years into the litigation the district court abstained, and we held this an abuse of discretion. We observed that the statute was clear enough to decide the constitutional question without further time-consuming proceedings in state court. A case that is well under way, we said, should be completed. Certification is less costly and time-consuming than abstention, but "no person" is easier to understand than "equivalent." What makes this a good case for certification when the abstention in *Mazanec* was an abuse of discretion? The majority does not say.

*Brockett v. Spokane Arcades, Inc.,* —— U.S. ——, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), is the Supreme Court's latest decision on point. The plaintiff challenged a statute banning certain books and films that "appeal to the prurient interest." The case turned on the meaning of "prurient" and "lust," two terms that the parties vigorously debated from the beginning. The court of appeals declined to abstain and held the statute unconstitutional. The Supreme Court found "prurient" and "lust" clear enough to be dealt with by a federal court, and it held the statute constitutional if these words are defined to exclude "normal sexual appetites." Now "prurient" and "lust" make "no person" look like a beacon of clarity, and three Justices in *Brockett* argued that the Court should have abstained or certified the construction of the law to the Supreme Court of Washington. 105 S.Ct. at 2804–05 (O'Connor, J., joined by the Chief Justice and Rehnquist, J.). The Court thought otherwise. What makes this a good case for certification when *Brockett* was not? The majority does not say.

Certification might avoid a constitutional issue, but this was true in *Brockett* and *Mazanec* as well. Ours is not an especially

difficult constitutional issue anyway. The Supreme Court has repeatedly upheld restrictions on candidates' activities more onerous than those contained in § 10–4. See *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (state may enact disaffiliation and sore loser statutes that lock a candidate into a political party for a year and forbid running in general election after losing in a primary); *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (state may enact rule requiring a public official to resign from office in order to be a candidate for a different office). Cf. *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (state may require a voter to select a single political party and make the election binding for one electoral season); *American Party of Texas v. White*, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974) (a state "may insist that intraparty competition be settled before the general election"). The Court reached these conclusions using a "strict scrutiny" approach, from which it has since retreated. See *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 528, 88 L.Ed.2d —— (1985); *Dart v. Brown*, 717 F.2d 1491, 1498–1504 (5th Cir.1983), cert. denied, —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984).

Section 10–4 is a good deal less restrictive than a disaffiliation statute or a resign-to-run statute. These statutes impose large costs on running or make any change of party lines impossible. Section 10–4, by contrast, imposes a modest cost on changing parties during an election season. A person who remains in the same party may use one group of solicitors to obtain signatures for as many offices as he seeks. A person who changes parties will need another group of people to circulate petitions. The relative disadvantage that § 10–4 imposes on dual-party candidates does not affect the total number of signatures the candidate must obtain. Moore needed 600 signatures to get on the primary ballot for the senate, and he needed 1,500 to get on

the general election ballot for the house whether or not he switched parties. Section 10–4 does not affect the number of signatures needed and therefore does not affect the number of circulator-hours needed to obtain the signatures. It affects only the identity of those who circulate petitions. A candidate who switches parties during an election campaign must demonstrate a somewhat broader base of support by being able to attract a new group of circulators.

The state's justifications for § 10–4 may not apply as forcefully to candidates as to other circulators, but the Court has never required a perfect fit between justification and application. This case is easier on the merits than either *Mazanec* or *Brockett*. Yet those courts reached the merits, while the majority certifies a question to the Supreme Court of Illinois.

**The questions to be certified.** If we are to seek the views of the Supreme Court of Illinois, we should ask it to clarify the statute on the points of *genuine* obscurity. Moore's first argument on appeal is that § 10–4 is unconstitutionally vague—but not because of an ambiguity in "no person". Moore says that the application of the statute to dual circulations for two major parties is unclear, and that if it does not apply to such circulations it discriminates in favor of major parties. He also maintains that the statute's application to circulations for a party and then an independent candidacy is uncertain.

An additional ambiguity lurks here: what is the "next primary or general election" of which the statute speaks? If the statute applies only to consecutive races for the same office (i.e., the state house of representatives in primary followed by general election), it does not affect Moore, who first ran in the primary for state senate and then tried to enter the general election for the state house of representatives. Perhaps, too, the statute applies only to dual circulations for the "next ... election", be it primary or general. On this view, if Moore circulated petitions first for the house and then for the senate during

the primary election season, § 10–4 would apply, but the statute would not apply to a circulation for the house in the primary followed by a circulation on a different party line for the same office at the general election—a different "election."

The case for certifying this question is far more powerful than the case for certifying the definition of a "person." Although the state has applied the statute consistently to candidates, it has not been consistent about the application to different elections. The Board of Election Commissioners of Cook County once rejected a challenge to signatures gathered on behalf of a candidate in Moore's position with the comment (*Marcus v. Nimrod*, No. 82 CO EB 3):

> [T]here is no statutory or case law prohibition against one circulating a nominating petition for a candidate for the primary election and then circulating a petition to form a new political party and to nominate another candidate for a different office for a different election, to wit, the General Election. . . .

Moore raised this issue on every occasion. There is a genuine ambiguity. Like the question the majority has certified, a question about the temporal domain of the statute could be answered in a way that would enable us to avoid a constitutional issue. Why certify one question but not the other? The majority does not say. Why not certify the issues the parties *have* litigated, concerning which Moore says the statute is ambiguous? The majority does not say.

This certification may come out right in the end. If the statute is as clear as I think it is, the state court's answer is foreordained. There will simply be a waste of the parties' time and money. But if the state court construes "person" not to include candidates, then we have a real problem, because we cannot act on the advice we have received. We ought not to put the Supreme Court of Illinois, or our own court, in such a pickle.