CITIZENS FOR JOHN W. MOORE PARTY, et al., Plaintiffs,

v.

BOARD OF ELECTION COMMISSIONERS OF the CITY OF CHICAGO, et al., Defendants.

No. 82 C 5901.

United States District Court, N.D. Illinois, E.D.

June 24, 1987.

Susan Bandes, Harvey Grossman, Roger Baldwin Foundation of the ACLU, Chicago, Ill., for plaintiffs.

Aldus S. Mitchell, Donald E. Hemmesch, Jr., Boodel, Sears, Sugrue Giambalvo & Crowley, Charles R. Bernardini, Asst. States Atty., Michael Levinson, Bd. of Elec. Com'rs, James M. Scanlon, State Bd. of Elections, Chicago, Ill., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

WILLIAM T. HART, District Judge.

In prior proceedings this court considered the constitutionality of a provision of the Illinois Election Code, Ill.Rev.Stat. 1981, ch. 46 ¶ 10–4, which provides, in part, that "no person shall circulate or certify petitions for candidates of more than one political party, or for an independent candidate or candidates in addition to one political party, to be voted upon at the next primary or general election." This provision resulted in the exclusion from the ballot of plaintiff John W. Moore as the candidate of the Citizens for John W. Moore Party in the 1982 general election for members of the Illinois General Assembly. After a trial it was held that (1) the Election Code section does not violate the Equal Protection of the Laws Clause of the Fourteenth Amendment on the theory that it is applicable only to new political parties and independent candidates, because it is not so limited, and (2) the provision did not violate plaintiffs' First Amendment speech, association or ballot access rights. *Citizens for John W. Moore Party v. Bd. of Election,* 599 F.Supp. 662 (N.D.Ill.1984).

On appeal, the United States Court of Appeals for the Seventh Circuit, one judge dissenting, certified to the Illinois Supreme Court the question whether the statute applies "to signatures gathered by candidates for office?" *Citizens for John W. Moore v. Bd. of Elect. Com'rs,* 781 F.2d 581 (7th Cir.1986) (*"Moore I"*). The Illinois Supreme Court declined to answer the certified question. *Citizens for John W. Moore v. Bd. of Election,* —— Ill.3d ——, 94 Ill.Dec. 69, 487 N.E.2d 946 (1986). Thereafter, the Court of Appeals held that the statute was constitutional as it applied to non-candidate circulators. The Court of Appeals remanded the case for a "focused" First Amendment consideration of the application of the statute "to candidates as circulators." *Citizens for John W. Moore v. Bd. of Elec. Com'rs,* 794 F.2d 1254 (7th Cir.1986) (*"Moore II"*).

In *Moore II,* the Court of Appeals states: On remand the district judge may determine that candidates and non-candidate circulators have materially identical first amendment interests and that, despite the different roles they play in the electoral process, both are subject to the state's proffered justifications. Or he may hold that Moore the candidate failed to carry his burden in this regard. On the other hand, he could decide that the justifications offered for § 10–4, as ap-

plied to candidate circulators, are inadequate or nonsensical. The record might support any of these conclusions. The district court should make them first, and there will be an occasion for appellate review later.

781 F.2d at 1263.

At a status hearing after remand this court posed the following questions in order to obtain any additional information concerning the burdens and justification of the statute:

(1) How many circulators where there in each of the campaign efforts by Moore?

(2) How many were the same?

(3) How long did it take to collect the signatures each time?

(4) What is the geographical size of the districts?

(5) Why were the signatures invalidated?

(6) Who gathered the invalidated signatures?

Some of the information sought is contained in the record. Some is not. Neither party sought to present additional evidence.

## I.

### FINDINGS OF FACT

For the purpose of this proceeding on remand the uncontested facts set forth in the original final pretrial order are again adopted as findings of fact. (Paragraphs 1–36 of the original findings of fact are reported at 599 F.Supp. 664–668).

Based on the testimony and exhibits submitted at the previous trial and for the purpose of this proceeding on remand the court finds as follows:

37. Plaintiff Moore was identified with the Democratic Party prior to the formation of the Citizens for John W. Moore Party. He unsuccessfully ran in the 1980 Democratic Party primary for the office of state representative in the Illinois General Assembly.

38. In 1982 Illinois was divided into legislative districts for the election of 59 senators and representative districts for the election of 118 representatives. Each legislative district contained two representative districts.[1] The legislative and representative districts here involved are the 16th Legislative District and the 31st Representative District. The 31st Representative District is contained within the 16th Legislative District. The districts are in the Englewood Community area of the City of Chicago, Illinois, a compact urban area.

39. Prior to March 16, 1982, Moore and a partially identified group of circulators gathered signatures for petitions to place him on the Democratic Party primary ballot for the office of state senator, 16th Legislative District.

40. One of the primary petitions subscribed on January 20, 1982 reads, in part, as follows:

We, the undersigned members of and affiliated with the Democratic Party and qualified electors of the Democratic Party in the 16th Legislative District of the State of Illinois, do hereby petition that John W. Moore, who resides at 5917 S. Throop St. in the City of Chicago Zip Code 60636, County of Cook and State of Illinois, shall be a candidate of the Democratic Party for the nomination for the office of State Senator of the State of Illinois, for the 16th Legislative District to be voted for at the primary election to be held on the 16th day of March A.D. 1982.

[25 lines for signatures and addresses]

The petition contains the following certificate:

I John W. Moore hereby certify that I am a registered voter of the political division for which the candidate is seeking nomination, that I reside at 5917 S. Throop Street, City of Chicago, County of Cook, 16th Legislative District in the State of Illinois, and that the signatures on this sheet were signed in my presence and are genuine to the best of my knowledge and belief and the persons so signing

---

1. *See Citizens Party v. Ill. State Bd. of Elections,* 546 F.Supp. 1050, 1052 (N.D.Ill.1982) for a history of the composition of the legislature and voter-signature nominating requirements.

were at the time of signing the petition, qualified voters of the Democratic Party, residing in the 16th Legislative District, and that their respective residences are currently stated as above set forth.

41. Moore and his supporters obtained 1,000 signatures to place his name on the primary ballot.

42. Moore withdrew from the Democratic Primary during February 1982. He testified as to his reasons for withdrawal from the Primary contest as follows:

Well, I came under—I withdrew, I withdrew my candidacy at that time because we were under severe pressure and the people that supported me felt that it would be more practical for us to run later on in the general election where I could be one on one against the regular party candidate rather than coming up under the opposition of two strong candidates who had tremendous resources in terms of money and manpower.

\* \* \* \* \* \*

Well, as I told you before, it came from the regular Democratic Party opponents that I had in the person of Mr. Charles Chew, who was the incumbent State Senator who had recently been—you know, who was Senator in one district and came into that district somewhat unexpectedly, because we had not expected—the people in the community and the district who had worked with me and supported me were expecting Mr. James C. Taylor to run again for office because he was the incumbent in our District. He decided not to run again. He knew that we had major opposition to his candidacy and his office, so instead they brought Mr. Charles Chew in there at the last minute, and then there was a battle seemingly in the regular Democratic Party itself, because Committeeman Bill Parker felt that he could sponsor his own candidate in the person of Mr. Jewel Frison. They had all kinds of precinct workers, they had X number of

dollars and they even told me personally that, you know, they would do everything within their power. There was no way that they felt I could win the election in there because they would throw everything at me, all their weight financially as well as manpower, and based upon those factors and coming directly from them as well, we stated that, okay, this is—you know, this is foolish for me to continue an effort to win in the primary under that type of pressure, is I withdrew as a candidate, and those are the reasons why I withdrew. You asked me why, what type of severe pressure. I am telling you what that pressure was.

43. Moore testified that his race for the General Assembly in the 31st Representative District was part of his opposition to the regular Democratic Party, stating as follows:

Q. Why did you decide to run for a State Representative?

A. Because people encouraged me to do so. They felt it was the most practical thing to do under the circumstances, that we still had the basic problems, the same basic needs, I still had the same platform, that we would move on to try to field a candidate, myself, who would represent the best interests of the people in our community.

44. Moore withdrew from the Democratic Primary to run against another Democratic nominee in the general election when he would be "one on one" in opposition to the Democratic nominee for state representative. He did not believe that he could overcome the party opposition to his candidacy for Democratic nominee for state senator.

45. Moore and his group of supporters began to circulate petitions for nomination to form a new political party in order to place his name on the ballot as a candidate for the office of member of the General Assembly 31st District in July 1982. The petition states:

We, the undersigned, qualified voters of the 31st Representative District of the State of Illinois, do declare that it is our intention to form a new political party in the political division aforesaid, to be known and designated as the Citizens for John W. Moore Party, and do hereby petition that the following named person shall be a candidate for the office hereinafter specified, to be voted at the General Election to be held on November 2, 1982.

A COMPLETE SLATE IS HEREBY PRESENTED

| NAME OF CANDIDATE | OFFICE | ADDRESS–ZIP CODE |
|---|---|---|
| John W. Moore | State Representative 31st District | 5917 S. Throop Street Chicago, Illinois 60636 |

[Spaces for 20 signatures and addresses]

I, John W. Moore, do hereby certify that I am a registered voter of the political division for which the candidate is seeking election, that I reside at No. 5917 S. Throop Street, in the City of Chicago, County of Cook, in the State of Illinois, and that the signatures on this sheet were signed in my presence, and are genuine, and that to the best of my knowledge and belief the persons so signing were at the time of signing the petition registered voters of the political division in which the candidate is seeking election, and that their respective residences are correctly stated, as above set forth.

46. Some of the same persons who signed Moore's petition for the Democratic primary also were approached and signed his petition for the general election as members of Citizens for John W. Moore Party.

47. Kimberly Tines circulated petitions on Moore's behalf in both the primary and the general election. She considered herself to be a democrat at the time of the 1982 primary election and previously voted as a democrat. She asked voters who signed primary nominating petitions if they were Democrats. She testified that the persons she approached a second time on behalf of Moore as a Moore Party candidate were not confused.

48. Tines testified that circulators were motivated by Moore's circulation of petitions and his active interest in the work of his campaign.

49. Moore testified that he had approximately six circulators including himself, his wife, Romeo Harrison, Kimberly Tines, Alice Bell and a few others. The record does not show who actually collected which signatures in each campaign except that Moore collected 975 signatures on behalf of his Moore Party candidacy.

50. Plaintiffs filed 3,829 signatures in support of Moore's petition for a place on the general election ballot. Objections were filed to Moore's gathering of 975 signatures. No other objections were filed as to other circulators. The Board allowed unchallenged objections to other signatures. The Board sustained objections to a total of 2,468 signatures including those gathered by Moore, resulting in a total of 1,361 valid signatures or 139 short of the 1,500 signatures required.

51. Moore testified that without his own circulation efforts he could not obtain the requisite signatures for a place on the ballot, and that his direct communication with the voters was an important aspect to the success of his "grass roots" campaign.

## II.

## OPINION AND CONCLUSIONS OF LAW

The lucid opinions of the Court of Appeals focus the issues which must be resolved. In *Moore I* the Court of Appeals stated its concern to be "whether the statute directly interferes with the candidate's ability to communicate with voters." The Court of Appeals stated that the resolution of this question bore upon (1) the state interest in insisting that intra-party competition be settled before the general election to avoid factionalism and party splintering; (2) the state interest in avoiding election abuse; and (3) the state interest in preventing voter confusion. 781 F.2d at 582.

The Court of Appeals opinion in *Moore II* provides significant guidance for the analy-

sis of the competing interests. Four patterns in Supreme Court decisions were deemed important. *Moore II* describes the patterns as follows:

The most recent decision of the Supreme Court suggests that courts should avoid putting decisions in terms of a "standard of scrutiny." *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983), instructs lower courts to "consider the character and magnitude of the asserted injury to the rights protected" by the constitution, to "identify and evaluate the precise interests put forth by the State", and then to decide whether the interests justify the restriction. The decision is functional, not turning on the form of words, and we have therefore held it important to follow what the Supreme Court does rather than attempt to articulate any formal methodology. *See Hall v. Simcox,* 766 F.2d 1171, 1174 (7th Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 459 (1985). *See also Dart v. Brown,* 717 F.2d 1491, 1498–1504 (5th Cir.1983), *cert. denied,* [469] U.S. [825], 105 S.Ct. 105, 83 L.Ed.2d 49 (1984). Here as in *Hall,* we start by identifying the important patterns in what the Court does.

1. The Court does not demand that the state prove at trial an empirical basis for its judgment that the regulation in question is useful. It will accept a logical justification....

[A]ll of the cases about the regulation of elections from *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), through *Anderson* ask only whether the state's justification is logically sound and consonant with common experience. The Court accepts justifications such as "maintaining the integrity of the various routes to the ballot" (*American Party,* 415 U.S. at 782 n. 14, 94 S.Ct. at 1307 n. 14) as "compelling" (*ibid.*) without proof that a given number of candidates is "too confusing" or that a particular statute does (or does not) have an identified effect on the number of candidates. *See Hall v. Simcox, supra.*

The sorts of interests states assert to justify regulation of elections often cannot be reduced to proof.... The Court has allowed states to justify regulation of elections with logical rather than empirical support in order to preserve the fundamentally political character of these choices.

... We require of Illinois a logical justification for § 10–4, the real justification and not a front for more sinister objectives, even though we do not insist on evidence establishing how the statute achieves its objectives....

2. Several cases say that the state should select the "least restrictive alternative" when regulating elections.... The Court has not used a "least restrictive means" test to under cut the more tolerant approach we have outlined above....

The point of looking at alternative methods of regulation is that the state must justify each incremental restriction in light of its incremental benefits....

3. A court may study the workings of a statute either in the large (how it influences the conduct of people in general) or in the small (how it applies to the plaintiff). One common line of argument in cases under the first amendment is that the state must justify not only the usual application of the rule but also the nature of the effects on (and the possibility of an exception for) the plaintiff. Ballot-access cases like this one are first amendment cases (see *Anderson,* 460 U.S. at 786–88 & n. 7, 103 S.Ct. at 1568–69 & n. 7) so that in order to decide whether to examine the systematic effects of the statute or the effects on Moore in particular, we must consider the evolution of first amendment doctrine.....

... The question today is whether the *rule* is adequately justified, not whether the plaintiff's case is a paradigm for application of the rule or whether the law would fail if the plaintiff were treated differently.... We must ... inquire how § 10–4 usually operates, not how it affected Moore.

4. One variant of the argument that § 10–4 is both overbroad (as applied to Moore) and underinclusive (because it does not pursue to the hilt the interests the state asserts on its behalf) is a contention that the statute is not part of a comprehensive plan. Indeed it is not. It is an occasional piece of legislation. Moore invites us to judge it harshly as a result. But *Clements,* which applied the step-at-a-time doctrine to legislation affecting elections, is sufficient reply. The constitution does not require a state to adopt comprehensive plans or none at all. It is enough if the law the state adopts serves permissible purposes....

794 F.2d at 1257–59 (citations omitted).

The first step in the analysis is to assess the burden § 10–4 imposes on the protected First Amendment speech, association and ballot access interests of a candidate circulator. The provision is not an absolute ban on ballot access but its application prevents Moore from participating in one important step in a second effort to be elected to office in the same primary and general election period. The gathering of 1,500 voter signatures is a vital separate step in this activity. A campaign worker testified that the morale of the circulators is also involved.

■ How great then is the burden on the candidate's right to associate with and speak directly to voters? The Board argues that Moore was permitted to accompany other circulators in a person to person canvass for signatures. Would he be required to remain silent in order to comply with the statute? The spectre of a mute candidate is a contradiction. Defendants argue he could speak so long as he did not perform any certifying function. This novel interpretation of § 10–4 has not previously been suggested, is of doubtful practical application, and finds no support in Illinois case law interpreting § 10–4. The Illinois courts construing § 10–4 appear to hold that the same person circulating the petitions must perform the certifying function. *Fortas v. Dixon,* 122 Ill.App.3d 697, 462 N.E.2d 615, 617, 78 Ill.Dec. 496, 498 (1st Dist.1984).

The extent of the speech burden imposed upon a candidate circulator must be viewed by the effect on his total campaign of being precluded from speaking to persons while they are asked to sign his nominating petitions. While this may be an element of a grass roots campaign, it cannot be judged on this record as the usual candidate's sole or most important speech activity. The ban does not operate on all speech. The candidate is not limited in his speech to those signing his petitions except when seeking their formal endorsement of his petitions. The candidate's speech to these persons in every other aspect of the campaign is unlimited and will presumably constitute the greatest part of a campaign effort.

The limitation here imposed is unlike the total voter association ban recently struck down in *Tashjian v. Republican Party of Connecticut,* —— U.S. ——, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), or the total disqualification struck down because of the candidate's speech in *Brown v. Hartlage,* 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

Illinois has now adopted a narrow "sore loser" statute, the effect of which to limit persons from being candidates in both the primary and general election. Only in a case such as this, when a candidate circulator actually withdraws from the primary and then refiles for the general election, would the bar of the statute prevent the candidate from circulating his own petitions. Noting this change, the Court of Appeals stated that "the new sore loser statute diminishes the adverse incremental effects of § 10–4." *Moore II,* 794 F.2d at 1262, n. 2.

The ballot access burden as reflected by the facts in this case is that without Moore's 975 gathered signatures and with other signatures invalidated for other undisclosed reasons (which may not be unusual), Moore fell 139 signatures short of obtaining a place on the general election ballot. Although Moore apparently told the Court of Appeals at oral argument that some of the 1,361 valid signatures were obtained by dual circulators and also vul-

nerable (*Moore I*, 781 F.2d at 585), those facts were not proven before this court either initially or on remand. The extent of the burden on access to the ballot appears to be the effort necessary to obtain 139 additional valid signatures or less than 4% more than the number gathered. This does not demonstrate a heavy burden.

The motivation or morale of circulators—important in any campaign—was also given as a reason for Moore's participation in the petition drive. Disqualification prevents joint efforts. The burden does not appear, however, to be a speech or association limitation of the same order as a bar to contact with voters. Association with circulators is not prevented even if limited. Inspiration of campaign workers is not a protected activity. The First Amendment implications are indirect at best.

The first justification advanced for the application of the statute by the state is as a measure to avoid factionalism and party splintering. The facts in this case tend to indicate that Moore, a Democrat, saw defeat facing his effort to become the Democratic party nominee for State Senator in the Englewood area, so he withdrew to contest the Democratic party's nominee for state representative in the same area, in the general election. This conduct is illustrative of factionalism and splintering continuing from a primary to a general election. While § 10–4 may not be the most effective measure to limit such activity it is not fanciful to regard it as one means in a total election code designed to discourage continuing primary disputes into the general election. This aspect of the case does not change when the petitions are in the hands of the candidate circulator.

The possibility that "dirty tricks" or "abuse" of the kind explained in *Moore II*, 794 F.2d at 1261, will occur when petitions are circulated by the candidate seems remote. The candidate circulator facing the voter in a grass roots campaign would find it difficult to misrepresent the reasons for his candidacy. Raiding efforts do not seem feasible in person to person efforts by a new small party candidate in the general election. Defendants do not attempt to explain how Moore's individual effort could lead to campaign abuse.

Voter confusion is not entirely eliminated by the presentation of petitions by the candidate circulator. As this case illustrates, Moore initially sought nomination support from registered voters who were affiliated with the Democratic Party. Later in the election period he returned to some of the same voters with his petition for another office and asked some of the same registered voters who had described themselves as Democrats to petition for ballot position as members of the Citizens for John W. Moore Party. It may be that the candidate circulator can explain his position so well that the former Democratic party members do follow him into a new party, but the possibility for confusion is not insignificant, even if reduced by the communication of the candidate.

■ Having identified what appear to be the speech, association and ballot access burdens imposed on the candidate circulator and considering the justifications advanced by the defendants for the imposition of the restriction on a candidate circulator, it is concluded that plaintiffs have failed to prove that the First Amendment burdens are sufficient to warrant a conclusion that the statute, as applied to candidate circulators, is unconstitutional. The position of Moore is as described in *Moore I*, 781 F.2d at 588:

> The Supreme Court has repeatedly upheld restrictions on candidates' activities more onerous than those contained in § 10–4. *See Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (state may enact disaffiliation and sore loser statutes that lock a candidate into a political party for a year and forbid running in general election after losing in a primary); *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (state may enact rule requiring a public official to resign from office in order to be a candidate for a different office.). *Cf. Rosario v. Rockfeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (state may require a voter to select a single political party and make the election

binding for one electoral season); *American Party of Texas v. White*, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974) (a state "may insist that intraparty competition be settled before the general election"). The Court reached these conclusions using a "strict scrutiny" approach, from which it has since retreated. *See Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir.), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d [459] (1985); *Dart v. Brown*, 717 F.2d 1491, 1498–1504 (5th Cir.1983), *cert. denied*, [469] U.S. [825], 105 S.Ct. 105, 83 L.Ed.2d 49 (1984).

Section 10–4 is a good deal less restrictive than a disaffiliation statute or re-sign-to-run statute. These statutes impose large costs on running or make any change of party lines impossible. Section 10–4, by contrast, imposes a modest cost on changing parties during an election season. A person who remains in the same party may use one group of solicitors to obtain signatures for as many offices as he seeks. A person who changes parties will need another group of people to circulate petitions. The relative disadvantage that § 10–4 imposes on dual-party candidates does not affect the total number of signatures the candidate must obtain. Moore needed 600 signatures to get on the primary ballot for the senate, and he needed 1,500 to get on the general election ballot for the house whether or not he switched parties. Section 10–4 does not affect the number of signatures needed and therefore does not affect the number of circulator-hours needed to obtain the signatures. It affects only the identity of those who circulate petitions. A candidate who switches parties during an election campaign must demonstrate a somewhat broader base of support by being able to attract a new group of circulators.

The state's justifications for § 10–4 may not apply as forcefully to candidates as to other circulators, but the Court has never required a perfect fit between justification and application.

IT IS THEREFORE ORDERED as follows:

On remand the court finds the contested issues of fact and law in favor of defendants and against plaintiffs and dismisses this case with prejudice and with costs to defendants.