**CITIZENS FOR JOHN W. MOORE PARTY, et al.,**
**Plaintiffs-Appellants,**

v.

**BOARD OF ELECTION COMMISSION-ERS OF the CITY OF CHICAGO, et al., Defendants–Appellees.**

No. 87–2171.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1988.

Decided April 18, 1988.

Theodora M. Rand, Roger Baldwin Found. of ACLU, Inc., Chicago, Ill., for plaintiffs-appellants.

A.L. Zimmer, Ill. State Bd. of Elections, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

John W. Moore and his political party contend that § 10–4 of the Illinois Election Code, Ill.Rev.Stat. ch. 46 § 10–4, violates the first amendment to the Constitution. Section 10–4 prevents anyone from collecting signatures on behalf of different parties during the same election season. It kept Moore out of the race for the Illinois House of Representatives in 1982, because Moore first qualified for and then withdrew from a primary election in the Democratic Party before forming the Citizens for John W. Moore Party and using the same people (including himself) to collect signatures to qualify for the ballot in the general election. When last the case was here, we held that § 10–4 is constitutional as applied to Moore's supporters but remanded for further proceedings to address the application of § 10–4 to Moore as the candidate. 794 F.2d 1254 (1986). The district court concluded that § 10–4 is a slight burden on the candidate's ability to run for office and satisfies all constitutional standards. 665 F.Supp. 1334 (N.D.Ill.1987).

The plaintiffs' initial attack on § 10–4 was that the statute infringed the freedom of political association. Although we rejected this contention, we remanded the case because we were concerned that the application of § 10–4 to candidates might affect the freedom of speech of the candidate. 794 F.2d at 1263. We contemplated that the parties would introduce additional evidence showing the effect of § 10–4 on the speech of candidates in general and making concrete the justifications for (or adverse effects of) the statute. No one offered such evidence, however, and both sides have continued to address their attention more to freedom of political association than to freedom of speech. The district court's opinion on remand followed this lead.

As a freedom-of-association claim Moore's case already is over, for the reasons given in our earlier opinion. Section 10–4 is a middle ground between "sore loser" and "disaffiliation" statutes of a sort the Supreme Court sustained in *Storer v. Brown*, 415 U.S. 724, 733–36, 94 S.Ct.

1274, 1280–82, 39 L.Ed.2d 714 (1974), on the one hand, and entirely open competition, on the other. Section 10–2 of the Illinois Election Code, a sore loser statute, provides that the loser in a primary election cannot run in the next general election. Section 10–2 did not bar Moore from running in the general election because he quit the primary before he could lose it. Section 10–4 then imposed a lesser sanction: Moore could run, but only if he could attract a new group of petition circulators to get the signatures necessary to qualify for the ballot.[1] Because Moore had been a circulator in his primary campaign, he had to find a person to replace his own services as circulator. The incremental burden of finding one extra circulator (beyond those needed to replace the non-candidate circulators) is slight. As Moore observes, the gain (preserving the party structure and reducing factionalization by increasing its cost) is correspondingly slight, but the Constitution does not insist that the government accomplish a lot by each enactment. As our prior opinion stressed, the proper inquiry is into the ratio between benefit and burden. We remarked before that Moore could have been excluded from the ballot by a sore loser statute. 794 F.2d at 1258–59, 1261–62. Whenever a state takes a more tempered course, it may face the challenge that the less ambitious statute achieves too little to be valid. We rejected that argument before, and we see no reason to change our view.

The argument based on freedom of expression requires a different analysis, however. Moore wants to convey the message that he is a "grass roots" candidate, one willing to do his own work. He believes that § 10–4 interferes with his ability to communicate this message because it prevents him from carrying his own petitions.

*Buckley v. Valeo*, 424 U.S. 1, 51–54, 96 S.Ct. 612, 650–51, 46 L.Ed.2d 659 (1976), holds that the government may not interfere with a candidate's expenditures on his own behalf, even though it may regulate contributions to his cause; similarly, Moore contends, the government may not interfere with how a candidate chooses to spread his message, even though it may regulate the conduct of supporters. Moreover, the ban of § 10–4 falls with special force on impecunious candidates (who find it easier to "hire" their own time than to hire professional circulators) and on candidates with a particular message. Cf. *Brown v. Hartlage*, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). A candidate's message is more credible if he acts on his beliefs. A candidate whose platform was "Support the Fat Cats" would not want to circulate his own petitions and could send his "message" by hiring lackeys. This viewpoint-based effect makes the statute unconstitutional, the argument concludes.

This is an alluring but ultimately unsuccessful line of argument. Section 10–4 simply does not regulate speech. First, it attaches a consequence to running in a primary election and leaves unfettered those who did not.[2] *Buckley* observed that the government may attach rationally-justified consequences to voluntary conduct, even though the consequences would be unconstitutional if imposed independently. See 424 U.S. at 57 n. 65, 96 S.Ct. at 653 n. 65 (holding that a candidate who accepts public funds may be forbidden to exceed the spending limits, even though unlimited spending otherwise is a constitutional right). Second, § 10–4 regulates conduct, the collection of signatures. True, the conduct has an expressive consequence, but so too did sleeping in the park, the subject of

---

**1.** Section 10–4 applies to persons who did not run for office in the primary but simply circulated petitions on behalf of a candidate of a different party, or an independent candidate, and who later decide to run themselves. Therefore, Moore argues, § 10–4 is not a rational method of "raising the price" of running under different party banners in the same election season. Yet Moore ran in the Democratic Party's primary and did not offer to show that this application of § 10–4 reaches a significant number of persons, or that if such persons exist they have encountered trouble qualifying for the ballot in the general election. We therefore leave for another day any questions that could be raised about the application of § 10–4 to signatures collected by a candidate running for the first time in the general election.

**2.** Subject to the qualification in footnote 1, above.

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The message in question (that the homeless have no place to go and need governmental assistance) was linked to the conduct, just as Moore's message may be linked to his—and the message also was one that could not readily be conveyed by other means. The poor could not convey the same message by renting hotel rooms, just as Moore could not convey the same message by hiring professional solicitors; and sleeping in the park may have been an uncommonly effective way to send a particular message. Still, a legitimate and viewpoint-neutral governmental interest in regulating the conduct is sufficient. In *Clark* the government forbade sleeping in the park no matter the message, indeed no matter whether there was a message. Illinois forbids circulating petitions for two parties no matter the message, indeed no matter whether there is a message.

Undoubtedly the rule affects the Citizens for John W. Moore Party differently from the Fat Cat Party, because the candidate of the Fat Cat Party[3] would not want to (and could not) use the act of collecting signatures on his own behalf as a part of his message, but the government need not regulate in a way that reflects the different messages that may be attached to the same conduct. See *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The obligation of the government is to be viewpoint-neutral, and to be content-neutral in all but the rarest cases. *Boos v. Barry*, — U.S. —, — – —, 108 S.Ct. 1157, 1162–64, 99 L.Ed.2d 333 (1988); *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327–30 (7th Cir. 1985), affirmed, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). *Brown v. Hartlage* dealt with a viewpoint-based regulation of speech: the statute (which the Court held unconstitutional) forbade a candidate to pledge to reduce his own salary.

Section 10–4 regulates conduct, and it is both viewpoint-neutral and content-neutral.

It escapes the fate of the statute in *Brown*. Section 10–4 does not affect Moore's speech. He can go wherever he wants and say anything he likes. Neither his method nor his message matters. He can even circulate all the petitions he wants and collect all the signatures he likes; they just won't count toward the number needed to get him a place on the ballot. Having a different message would not avoid the application of § 10–4. The state's regulation no more stops Moore from speaking than would the lack of a need to gather signatures. Suppose Moore had stuck to his guns in the primary and prevailed. He would then have been on the ballot for the general election without the need to gather more signatures. Could he contest this rule by saying that he had been forbidden (by the irrelevance of signatures) to convey the message that he was willing to do his own work? Whether the state makes signatures unnecessary or requires someone other than the candidate to gather them, the effect on speech is the same.

The regulation of signature collection is not different in principle from the many other speech-plus-action cases. Take, for example, *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), which involved the delivery of a message plus the solicitation of contributions at county fairs. The state allowed an unhindered delivery of the message but required the solicitation to take place at booths, and the Court sustained the statute as supported by a legitimate governmental interest. We have concluded that there is a legitimate interest behind § 10–4, and its application to candidates then follows as the application of the booth requirement did in *Heffron*. The Krishnas said that solicitation on-the-spot would make the message (and the religious movement) more effective, just as Moore says that personal solicitation of a signature would make his message and movement more effective, but his argument is no stronger than the Krishnas'.

---

**3.** On the first amendment rights of cats, fat or otherwise, see *Miles v. City Council of Augusta,*

710 F.2d 1542 (11th Cir.1983).

There is also no good reason to differentiate the candidate from his supporters for purposes of freedom of expression. Section 10–4 affects candidates and supporters identically. Anyone (including Moore) may stump the town, law or no; anyone (including Moore) may collect a signature only if he has avoided playing the same role for another party during the election season.[4] Each of Moore's supporters has the same constitutional right of speech as Moore, and each may have the same interest in spreading Moore's message and making the campaign succeed. We could not find a case holding that candidates possess greater rights to speak than do supporters; candidacy is just an occasion for the exercise of a right to speak that everyone possesses, and it is not a reason to enlarge the right of speech. The differences seem to run the other way. After a candidate accepts public funding and suffers a restriction of his own right to speak, independent supporters still may speak and spend to their hearts' content. E.g., *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Resign-to-run, sore loser, and disaffiliation statutes affect only the candidates. See *Storer* and, e.g., *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (sustaining a resign-to-run statute).

In the end, § 10–4 injures Moore in his quest to be a candidate and not in his role as speaker, and there is no fundamental right to be a candidate. *Clements*, 457 U.S. at 963, 102 S.Ct. at 2843–44. Section 10–4 is simply a less restrictive alternative to a permissible sore loser statute, one that would keep out of the general election everyone who enters a primary and does not win. One can lose a primary by withdrawing in the face of defeat, as well as by sticking in to the bitter end. The interest in resolving disputes through party channels and preventing the proliferation of factions is no less in one case than in the other. Moore withdrew in the face of defeat, 665 F.Supp. at 1337, and Illinois could

have barred him from making another run. This would have stifled both political association and speech more effectively than § 10–4. Instead of prohibiting Moore from making a second try, Illinois simply required him to show extra support by attracting a new group of circulators, a group large enough to replace his services (as a circulator) in addition to the services of his other circulators. This is less effective in preventing fissiparous conduct, but much less restrictive as well. If we were to accept Moore's invitation to hold § 10–4 invalid, that might induce Illinois to make § 10–2 broader. The cause of speech would not gain from such a trade.

AFFIRMED.

---

**4.** Whether Moore may stump *with* a supporter who collects and certifies signatures, as the State Board of Election Commissioners contends, is a question of state law unimportant to our disposition.