Paul OGDEN and Indiana Right to
Life Political Action Committee,
Plaintiffs,

v.

Candace MARENDT, in her official ca-
pacity as Chairman of the Marion
County Election Board, Doris Anne
Sadler, in her official capacity as Vice
Chairman of the Marion County Elec-
tion Board, STeven R. Eichholtz, in
his official capacity as Vice Chairman
of the Marion County Election Board
Dudley R. Cruea, in his official capac-
ity as Chairman of the Indiana Elec-
tion Commission, Butch Morgan, in
his official capacity as a member of
the Indiana Election Commission, S.
Anthony Long, in his official capacity
as a Member of the Indiana Election
Commission, and Claudia E. Cum-
mings, in her official capacity as a
member of the Indiana Election Com-
mission, Defendants.

No. 1:03–cv–415–JDT–TAB.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 21, 2003.

James Bopp, Jr., Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, Daniel A. Ladendorf, Ladendorf & Ladendorf, Indianapolis, IN, for Plaintiffs.

Michael T. Schaefer, Douglas J. Webber, Office of the Attorney General, Indianapolis, IN, for Defendants.

## ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

TINDER, District Judge.

This matter comes before the court on Plaintiffs Paul Ogden and Indiana Right to Life Political Action Committee ("IRL-PAC")'s request for a preliminary injunction against the enforcement of Indiana Code section 3–14–1–2(a)(2)(3) on the ground that it infringes their First Amendment rights. Having reviewed the parties' briefs and heard oral argument on the issues, the court now rules on the Plaintiffs' motion.

### I. Statute

The provision of the Indiana Code challenged in this action provides, in pertinent part:

(a) A person who:

(2) prints on a slate during a primary election campaign the name or number of a candidate without the candidate's written consent; or

(3) prints, publishes, or distributes a slate during a primary election campaign unless at least five (5) days before it is printed and published the written consent .... of the candidates in whose behalf it is distributed [is] filed in the

office of the county election board in each county where the election is held; commits a Class A misdemeanor.

Ind.Code § 3–14–1–2(a)(2)–(3). Clearly, much depends on the meaning of the statutory term "slate." That term is defined as follows:

As used in this section, "slate" means a sample ballot, reproduction of an official ballot, or a listing of candidates:

(1) having the names or numbers of more than one (1) candidate for nomination at a primary election; and

(2) that expresses support for more than one (1) of the candidates set forth on the ballot or list.

Ind.Code § 3–14–1–2(b). In short, the law prohibits an individual or organization from printing, publishing or distributing a slate of candidates for nomination in a primary election without obtaining the written consent of the candidates five days in advance.[1] The Plaintiffs refer to this statute as an "anti-slating" provision (*e.g.*, Verified Complaint "V.C." ¶ 11), and that is a fair shorthand so long as it is kept in mind that slating is only proscribed where the person fails to secure the candidates' written consent five days before the printing of the slate. The parties' sole disagreement with respect to the construction of the statute relates to the meaning of the term "slate" and will be addressed in the discussion section.

## II. Facts

### A. Ogden

The following facts are alleged in the Plaintiffs' Verified Complaint, and are not in dispute unless noted. Plaintiff Paul Ogden, a resident of Marion County, Indiana, was a candidate in the May 7, 2002 Republican primary, where he sought that party's nomination for the office of Marion County Clerk. (V.C.¶ 5.) As part of his campaign, Ogden distributed a flyer which expressed support for himself and another candidate for party nomination for Sheriff. It read: "Vote McAtee for Sheriff and Ogden for Clerk." (V.C.¶ 12.)[2] The flyer also stated that it had been paid for the Ogden for Clerk Committee. (V.C., Ex B.) Prior to the distribution of this material, Ogden had sought McAtee's consent to the appearance of his name alongside Ogden's, but was told that McAtee did not wish to publicly consent, although he did not object to Ogden's distribution of the flyers, either.[3] (V.C.¶ 13.) On the day of the election, members of the Marion County

---

**1.** Subsection (a)(1) of the statute also contains provisions requiring a person who prints, publishes or distributes a slate during a primary election over the name of an organization of voters (subsection (a)(1)(A)) or over the names of at least ten voters in the political subdivision where the primary is being held (subsection (a)(1)(B)) to obtain the written consent of that organization or those individuals prior to putting out the slate. The Plaintiffs do not contest the constitutionality of § 3–14–1–2(a)(1). (Pls.' Reply Br. at 7.) Rather, their challenge is directed wholly to § 3–14–1–2(a)(2)(3).

**2.** A copy of the flyer is attached as Plaintiffs' Exhibit B to the Verified Complaint.

**3.** The Defendants object to the allegation that McAtee refused consent as hearsay (Opp'n Br.

at 9, n. 3), although they do not contend that Ogden in fact received McAtee's written authorization. Indeed, the Marion County Election Board's own minutes to the May 7, 2002 meeting, where it is reported that "[a] spokesman for the McAtee campaign stated that no authority was given for this 'slate,'" indicate the absence of consent. (V.C., Ex. C.) It may be that the point of the Defendants' objection is to challenge Ogden's standing to contest the constitutionality of the statute. If so, the objection is misguided, because a court may assume the truth of the allegations in evaluating a motion to dismiss for lack of standing. *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir.1996). Thus, for the purposes of standing, the court will accept Ogden's averment that he lacked McAtee's consent to a joint slate, precipitating the Election Board's enforcement action. Otherwise

Election Board obtained one of the Ogden flyers. Pursuant to a subsequently convened meeting, the Election Board determined the flyers to be in violation of Indiana Code section 3–14–1–2 and approved a motion calling for their removal and confiscation. (V.C.¶ 14, Ex. C.) Letters announcing this action were sent to the precinct inspectors and polling sites. As a result, many of the campaign flyers already on display were confiscated, and Ogden and his supporters were prevented from handing out any further ones. (*Id.*) Ogden claims he fears prosecution stemming from this incident. (V.C.¶ 15.)

Although Ogden does not claim to be a candidate in this year's Marion County primary elections scheduled for May 6, 2003, he vows he will run again in future primary elections in the state of Indiana. (V.C.¶ 5.) Ogden also asserts that in future primaries he would like to print and distribute materials expressing support for multiple candidates without first having to seek their consent, but will not be able to do so unless the state is enjoined from enforcing the anti-slating law. (V.C.¶ 16.)

### B. IRLPAC

IRLPAC is a political action committee registered in Indiana which is dedicated to supporting political candidates who share its views, the bulk of which revolve around opposition to the availability of abortions. As part of its activities, it frequently endorses candidates for office, and distributes lists of these candidates to the public. (V.C.¶¶ 6, 17.) Accordingly, IRLPAC would like to print and distribute a list of endorsed candidates in the upcoming May 6, 2003 Marion County primary elections. IRLPAC would also like to post its list on its website. (V.C.¶ 18.) However, IRLPAC does not want to seek permission from the candidates who might receive its endorsement, for several reasons: it prefers to have its list stand on its own as independent speech, rather than being the product of coordination with endorsed candidates; it understands that some candidates may not wish to be known as having publicly consented to the association with IRLPAC and the other candidates it supports; and it wants to avoid the logistical difficulties involved in obtaining written consent from each candidate. (V.C.¶¶ 19, 21.) IRLPAC also objects to the five day waiting requirement as limiting its ability to make spontaneous endorsement decisions in the run-up to the elections. (V.C.¶ 20.)

IRLPAC also contends that it will not be able to print, publish, or distribute its endorsement list unless the Defendants are enjoined from enforcing Indiana Code section 3–14–1–2(a)(2)(3). (V.C.¶ 22.)

### III. Preliminary Injunction Standard

 A district court will grant a preliminary injunction if there is a reasonable likelihood of success on the merits of the claim, no adequate remedy at law, and failure to grant the injunction would cause irreparable harm to the party seeking it. *Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir.2002) (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). If the moving party has made a sufficient showing of those elements, the court then balances the relative harms to the parties depending on whether the injunction is granted or denied, and taking into account the public interest in the matter. *Id.* at 534 (citing *PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1267 n. 3 (7th Cir.1995)).

### IV. Discussion

#### A. Construction of the Statute

 Before undertaking an analysis of the constitutionality of the statute, the court needs to address the dispute over

resolution of this fact is immaterial to the issues presented in this motion.

the breadth of the anti-slating law, which depends on the meaning of the term "slate." That term is defined quite broadly in the statute itself: "a sample ballot, reproduction of an official ballot, or a listing of candidates having the names or numbers of more than one (1) candidate for nomination at a primary election; and that expresses support for more than one (1) of the candidates set forth on the ballot or list." Ind.Code § 3–14–1–2(b). At oral argument, counsel for the Defendants invoked the canon of statutory construction known as "ejusdem generis" to urge an interpretation of the phrase a "listing of candidates" which would require the listing to be somehow connected to the notion of a ballot which figures in the two preceding items. There is no warrant for this reading. First, the ejusdem generis principle only functions to resolve ambiguities in the statutory text. *See United States v. Irons,* 640 F.2d 872, 876 (7th Cir.1981) ("[Ejusdem generis] is intended only as an aid to ascertainment of legislative intent when uncertainty or ambiguity exists.") The Defendants have not shown, nor can the court discern, any ambiguity in the phrase "listing of candidates," so there is no need for recourse to this principle. Second, the Defendants' narrow interpretation of the phrase "listing of candidates" conflicts with the Marion County Election Board's *own* actions in confiscating the Ogden campaign flyers. While the flyers did contain a "listing of candidates"—Ogden and McAtee—

there was nothing "ballot-like" about them. Nonetheless, the Election Board still considered them to fit the definition of a slate. The court believes the Election Board was correct in that judgment, as the statute could not be more clear that a list of candidates, in addition to a sample ballot or reproduction of a ballot, is included in the statutory definition. The court thus declines to give the phrase "listing of candidates" anything less than its full meaning and scope.

### B. Level of Review

■ The court begins with the appropriate level of scrutiny afforded Indiana's anti-slating law. While the Defendants are somewhat vague about the matter, the court takes it they believe the law should be subject to rational review, or what the Supreme Court in *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 345, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), termed the "ordinary litigation test." [4] The Plaintiffs, for their part, claim the regulation imposes a severe burden on speech and should be accorded strict scrutiny.

In dealing with challenges to a state's election laws, the Supreme Court has recognized that there is no " 'litmus-paper test' that will separate valid from invalid restrictions." *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 213, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)) (in turn

4. In addition to the Supreme Court cases discussed below, the Defendants cite *Citizens for John W. Moore Party v. Bd. of Election Comm'rs of City of Chicago,* 794 F.2d 1254, 1257–58 (7th Cir.1986), in defense of "cursory scrutiny." (Defs. Br. at 5.) Here is what the court said: "Cursory scrutiny leaves the daily conflict of political forces to the political arena in which it belongs. But when the result of this process trenches on specific constitutional rights, such as the rights of speech and political association, the Court takes a closer look." *Id.* at 1258. The point the

Seventh Circuit was making was that the acceptability of logical rather than empirical justifications for the utility of a regulation in serving a compelling state interest "does not imply that anything goes." *Id.* Rather, where constitutional rights are involved, cursory scrutiny—the type of review afforded laws which do not impair constitutional rights—is *not* appropriate; courts require a "real justification." *Id.* As this case involves First Amendment rights, it requires close rather than cursory scrutiny.

quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1983)). In *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), the Court declared that whereas an election regulation imposing a severe burden on plaintiffs' rights must be narrowly tailored to advance a compelling state interest, "[l]esser burdens .... trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable', non-discriminatory restrictions." (citations omitted). In what is perhaps merely a different way of making the same distinction, the Court in *McIntyre* stated that an "ordinary election restriction," that is, one controlling "the mechanics of the electoral process" would merit review of the type used in "ordinary litigation"—weighing the interests of the state and the injured voters and upholding reasonable and nondiscriminatory regulations. *McIntyre,* 514 U.S. at 344–45, 115 S.Ct. 1511. Regulations of "pure speech," like the restriction on anonymous campaign literature at issue there, were, by contrast, subject to "exacting scrutiny." *Id.* at 345, 115 S.Ct. 1511.

■ Likewise in the present case, the anti-slating law burdens core political speech. The endorsement or expression of support for candidates for office whose views one shares goes to the heart of First Amendment protections. *See Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("there is practically universal agreement that a major purpose of th[e First] Amendment was to protect the free discussion of governmental affairs .... of course includ(ing) discussions of candidates [.]") (citing *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434,

16 L.Ed.2d 484 (1966)). "The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Ctr. Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (citing *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). The impact of this statute on political speech is especially burdensome because the most economical way of publicizing support for a number of candidates is through dissemination of a printed list of those persons— exactly what Indiana law considers a slate. The effect of the anti-slating measure is to prevent that expression unless, in the context of a primary election, the individual or organization procures the consent of the endorsed candidates. This represents a serious restriction on the ability of citizens and associations to advance their beliefs via their backing of candidates who, in their opinion, espouse these same views. *See, e.g., Eu,* 489 U.S. at 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (California's ban on party endorsements in primaries "directly hampers the ability of a party to spread its message and hamstrings voters seeking to inform themselves about the candidates and the campaign issues.")

■ The anti-slating law also places a heavy burden on the individual candidates themselves by forcing them to choose between *either* consenting publicly to a request for inclusion on a slate, thereby placing their imprimatur on that expression, *or* suppressing that speech entirely by withholding written consent. This scheme thus deprives a candidate of the freedom to retain any neutrality or ambiguity with respect to his would-be supporters.[5] By

---

**5.** The Defendants contest Ogden's standing to assert First Amendment injury on the part of primary candidates compelled to either sign on to a backer's slate or silence that support. They observe that Ogden has no plans to run

in the upcoming election, and argue that he lacks standing to assert the alleged injuries of absent third-parties. While Ogden concedes he will not enter the May 6, 2003 Marion County primary race, his political ambitions

the same token, those supporters lose the independent quality of their speech, as any slate they publish is now understood as having been licensed by the primary candidates in question. *Cf. Iowa Right to Life Comm. v. Williams,* 187 F.3d 963, 967 (8th Cir.1999) (upholding preliminary injunction against enforcement of regulation requiring candidate to either file statement disavowing independent expenditure advocating his election or take no action and have that expenditure deemed an expenditure by the candidate). As with the independent expenditure regulation voided in *Iowa Right to Life,* the statute here "eliminat[es] the independent nature of the speech and thus diminish[es] its value." *Id.* at 967.

Moreover, although the anti-slating law applies to expressions of support for primary election candidates, it does not correspond to the types of election regulations the *McIntyre* Court described as governing the "mechanics of the electoral process," *id.* at 344–45, 115 S.Ct. 1511, and where the Court had applied a lesser degree of scrutiny. *See, e.g., Storer,* 415 U.S. at 724, 94 S.Ct. 1274 (ballot access); *Anderson,* 460 U.S. at 780, 103 S.Ct. 1564 (filing deadlines); *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (write-in deadline).

Finally, it is true that the anti-slating law does not discriminate according to the speaker's viewpoint; compliance with the provision is not a function of anyone's beliefs. But it nonetheless blocks expres-

sions of political support which lack the requisite approval, and as such is "a direct regulation of the content of speech," *see id.* at 345, 115 S.Ct. 1511 (ban on anonymous campaign literature regulates content "even though it applies evenhandedly to advocates of differing viewpoints[.]") For those reasons, the statute will pass constitutional muster only if it is narrowly tailored to the advancement of a compelling state interest.[6]

### C. State Interests

■ The Defendants point to three distinct state interests promoted by the statute: the prevention of campaign fraud, the integrity of the election process through the preservation of party stability, and the protection of candidates' interest in *not* associating with other candidates or groups whose support they disavow.

As to the first asserted purpose, it is plain that the elimination of campaign fraud is a compelling state interest. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 349, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("We agree with Ohio's submission that this interest [in preventing fraud and libel] carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large."); *Burson v. Freeman,* 504 U.S. 191, 199, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) ("[The Court] has recognized that a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election pro-

---

have not yet been quenched, and he insists he will run again in future primaries in the state of Indiana. (V.C.¶ 5.) As the Seventh Circuit has held that political candidacy, like pregnancy, is capable of repetition yet evades review, that avowal of future intent is enough to confer standing on Ogden in his own right. *See Majors v. Abell,* 317 F.3d 719, 722 (7th Cir.2003) (reversing dismissal for lack of standing by reason of candidate's failure to run in recent elections because "[a] candidate

plaintiff no more has a duty to run in every election in order to keep his suit alive than an abortion plaintiff has a duty to become pregnant again in order to keep her suit alive.")

6. The court notes that this analysis is unaffected by the limitation of the statute to primary elections. *See Eu,* 489 U.S. at 223, 109 S.Ct. 1013 ("Free discussion about candidates for public office is no less critical before a primary than before a general election.")

cess."). The Defendants are correct that the written consent requirement contained in Indiana Code section 3–14–1–2(a)(3) successfully criminalizes certain varieties of fraud: for example, the attempt to smear an opponent by publication of a slate linking him to an unsavory character or organization; or generally the type of conduct that could expose a person to civil liability for defamation or false light publicity.[7] *See Branham v. Celadon Trucking Servs.*, 744 N.E.2d 514, 524 (Ind.Ct.App.2001) (person liable for portraying another in a false light where "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter[.]") (quoting Restatement (Second) of Torts § 652E (1977)).

The court thus agrees that the anti-slating law accomplishes the goal of preventing fraud and libel to a limited extent.[8] But if this means of regulating fraud is narrowly tailored, then "narrow tailoring must refer not to the standards of Versace, but to those of Omar the tentmaker." *Hill v. Colorado*, 530 U.S. 703, 749, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting). Not only does the statute fail to criminalize much conduct that is indeed fraudulent, it sweeps within its purview a great deal of perfectly truthful political speech. For one, as the Plaintiffs argue, interpreted literally such innocuous activities as keeping a printed record with a list of two endorsed candidates, sending an e-mail urging a friend to "vote for Smith and Jones," or printing such a list off a website would run afoul of the anti-slating law. (Pls.' Br. at 9.) This result no doubt runs contrary to the intent of the General Assembly in passing the law. But even were a construction of the statute devised which would somehow adhere more closely to legislative intent or confine the provision to more public displays, it would still proscribe much political speech untainted by fraud. For one-way expressions of support are a common fact of life in politics and, contrary to the Defendants, do not involve factual misrepresentations. That is, it may be a fair inference that a candidate endorsed by IRLPAC welcomes its endorsement, but all IRLPAC vouches for in endorsing a candidate is that *it* endorses *him*, not that he in turn supports it.[9] By

---

7. To modify slightly the example given by the Plaintiffs, a person who printed a flyer proclaiming "the Ku Klux Klan endorses Smith and Jones" would be subject to criminal sanctions unless he obtained the consent of Smith and Jones (and, according to section (a)(1) of the statute, the KKK.) (Pls.' Br. at 9.) Of course, the Plaintiffs are correct that the statute is under-inclusive with respect to fraudulent campaign practices; much defamatory or "false light publicity" conduct falls outside its strictures. *E.g.*, "the KKK endorses Smith" (not more than one candidate); "vote against child molesters Smith and Jones" (not an expression of support); or anything printed during a general election.

8. Although the continued effect of Indiana Code section 3–14–1–2(a)(1), whose constitutionality is not contested by the Plaintiffs, attenuates the Defendants' concerns as to campaign fraud to some degree. For that provision would continue to render criminal a slate published over the name of an organization (or group of voters) without that organization's consent. Thus, fictitious endorsements over a slate of candidates (as in the KKK example, see note 7) are still captured by the statute's ban.

9. The court acknowledges that the circulation of multiple unreciprocated endorsements could cause some voter confusion, but on numerous occasions the Supreme Court has held that states seeking to remedy voter confusion by restricting the flow of information available to the public face a heavy burden of persuasion. *See, e g., Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 370 n. 13, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (refusing to consider role played by anti-fusion statute in state's "supposed interest" of avoiding voter confusion); *Eu v. San Francisco County Democratic Ctr. Comm.*, 489 U.S. 214, 223,

regulating such a broad category of legitimate speech, the anti-slating law fails to narrowly advance the asserted state interest of fraud prevention. *See McIntyre*, 514 U.S. at 349–53, 115 S.Ct. 1511 (ban on anonymous campaign literature not narrowly drawn to state interest in preventing fraud and libel).

The Defendants also argue that the anti-slating regulation helps vindicate the state interest in orderly elections and a stable two-party system. That states have such an interest is not in question. *See Timmons*, 520 U.S. 351, 366–67, 117 S.Ct. 1364, 137 L.Ed.2d 589 (as long as not completely insulating major parties from outside competition, state may enact "reasonable election regulations that may, in practice, favor the traditional two-party system .... and temper the destabilizing effects of party-splintering and excessive factionalism"); *Tashjian*, 479 U.S. at 222, 107 S.Ct. 544 (compelling interest in integrity of two-party system); *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding registration deadline as preservative of integrity of electoral process by curtailing practice of "raiding" whereby members of one party switch affiliation just prior to the other party's primary in order to affect its outcome). The question is whether Indiana's anti-slating law is precisely designed to further the asserted purpose.

The Defendants claim that the statute bolsters party stability by preventing outside individuals or groups from interposing their own slates, which may diverge from the party officials' preferred candidates.

Otherwise, so the Defendants contend, these groups might interfere with party autonomy in much the same way as could non-party members under the blanket primary system struck down in *California Democratic Party v. Jones*, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). The comparison misses the mark. In *California Democratic Party*, the state-imposed election system intruded upon a political party's right to exclude those who chose not to associate with it from the process of nominating its candidate. *Id.* at 577, 120 S.Ct. 2402 ("California's blanket primary .... forces political parties to associate with—to have their nominees, and hence their positions, determined by—those who, at best, refused to affiliate with the party, and, at worst, have expressly affiliated with a rival.") *See also Eu*, 489 U.S. at 214, 109 S.Ct. 1013 (striking down state ban on party endorsements in primary); *Tashjian*, 479 U.S. at 208, 107 S.Ct. 544 (voiding law preventing party from opening its primary to registered independents). Here, by contrast, the Defendants do not complain of a state law impinging on a party's right to define its membership or control voter participation in its primary, but of individuals or organizations who, it is feared, might exercise undue influence over a party's primary if the current restrictions on slates are lifted. Thus any effect on primary elections would be purely the result of the exercise of independent private speech. The fact that the party hierarchy's favored candidates might lose out to candidates endorsed by outside groups or internal factions is the

109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) ("A highly paternalistic approach limiting what people may hear is generally suspect.") (citations and internal quotation marks omitted); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 221, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (closed primary election denying party ability to open its primary to registered independent voters not justified by state's desire to eliminate voter confusion). The Defendants make no claim that general elections in Indiana, free from the slating restrictions, are plagued by voter confusion as a consequence thereof; nor have they pointed to patterns of voter confusion in other jurisdictions lacking this regulation. They thus have not carried the requisite burden for this type of justification.

natural consequence of free speech protections and the whole reason for primary elections. "A primary is not hostile to intraparty feuds; rather, it is an ideal forum in which to resolve them." *Eu*, 489 U.S. at 227, 109 S.Ct. 1013 (citations omitted). Furthermore, it is far from clear that the anti-slating law has the desired salutary effect, as even now candidates may consent to their inclusion on competing slates, and such slates may proliferate. In sum, the Defendants have not shown that the regulation at issue promotes orderly elections and party stability without overly cramping the political speech necessary for free elections.

The final state interest served by the statute, according to the Defendants, regards the candidates' supposed right not to be associated with other candidates or organizations whose support they disown. The Defendants cite *California Democratic Party* for the proposition that "a corollary of the right to associate is the right not to associate." *California Democratic Party*, 530 U.S. at 574, 120 S.Ct. 2402. As that Court observed, "[f]reedom of association would prove an empty guarantee if associations could not limit control over decisions to those who share their interests and persuasions that underlie the association's being." *Id.* (quoting *Democratic Party of United States v. Wisconsin ex. rel. La Follette*, 450 U.S. 107, 122 n. 22, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981)) (in turn quoting L. Tribe, *American Constitutional Law* 791 (1978)). But that is just the point: the so-called forced association decried by the Defendants—the appearance of a candidate's name on a slate with other candidates—does not implicate a candidate's right to make associational decisions as described by *California Democratic Party*. It is certainly a far cry from the types of interference with a group's control over its activities, composition or message against which the Court has upheld an association's First Amendment

right to exclude. *See, e.g., California Democratic Party*, 530 U.S. at 567, 120 S.Ct. 2402 (blanket primary infringes on political parties' right to exclude nonparty voters from primary); *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (application of public accommodation law to require private organizers of parade to allow participation of group making statement organizers did not wish to convey violates organizers' First Amendment right to control the content of its expression); *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (use of public accommodation law to force Boy Scouts to accept gay scoutmaster impermissibly hinders group's ability to express its viewpoint regarding homosexuality).

In any event, even if a candidate's inclusion on a slate with other candidates does create the impression that he is in league with them, that result would not stem from the application of a public law imposing the association, but from a private person or organization's display of support. And the Defendants have offered no precedent for the notion that the existence of constitutional limits on a *state's* ability to intrude upon an association's expressive autonomy implies a related *state interest* in affirmatively protecting candidates from unauthorized showings of political support. If the candidate wishes to publicly disassociate himself from the slate, he is free to do so, but the state exceeds its powers when it stifles that speech on his behalf. Such solicitude for political candidates is misplaced. "This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' " *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

Consequently, the court discerns no valid state interest in the promotion of a primary candidate's associational rights to the degree of suppressing independent expressions of political support solely because they have not been authorized by the candidate.

### D. Weighing the Harms

As the Plaintiffs have demonstrated a likelihood of success on the merits of their claim, the court turns to the balance of the preliminary injunction analysis.[10] Fortunately that task is not difficult. As both IRLPAC and Ogden desire to publish, print or distribute slates in future elections, but will not be able to do so free from threat of prosecution unless the Defendants are prevented from enforcing the anti-slating statute, there is no adequate remedy at law. And since the anti-slating regulation impairs Plaintiffs' free speech rights, the harm sustained by them far outweighs any harm to the Defendants caused by the granting of the injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Taking into account the public interest and the relative harms to the parties, the court determines the injunction should issue.

The court also waives the requirement of Rule 65(c) of the Federal Rules of Civil Procedure, that a plaintiff post an injunction bond prior to the issuance of a preliminary injunction. The Defendants have not requested the Plaintiffs give security, nor does it appear they would incur any significant costs as a result of the injunction. The requirement of a bond would also impact negatively on the Plaintiffs' exercise of their constitutional rights and the rights of other members of the public affected by the anti-slating law. *See Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719, 738 (C.D.Cal.1996) (waiving bond requirement for case involving First Amendment freedoms); *Smith v. Board of Elections Comm'rs for Chicago*, 591 F.Supp. 70, 71–72 (N.D.Ill.1984) (same).

### V. Conclusion

In conclusion, the Plaintiffs' motion for a preliminary injunction against the enforcement of Indiana Code section 3–14–1–2(a)(2)(3) is **GRANTED**.[11]

---

**10.** The court notes that there is no need to address the reasonableness of the five day waiting period before publication of a slate, as it has found no justification for the written consent requirement even without such a delay.

**11.** The Plaintiffs sought consolidation of the hearing on the motion for preliminary injunction with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). The court **DENIES** that motion because certain matters regarding Ogden's claim, especially the remediation of certain minutes of the Election Board may require some discovery and other elaboration. The matter will be referred to the Magistrate Judge for the preparation of the case for trial on an expedited basis. Based on the determinations contained in this Entry, the ultimate issuance of a permanent injunction against the enforcement of the challenged portions of the statute is a virtual certainty. The only real matters left for trial appear to be factual development of the Election Board's conduct regarding Ogden in connection with the 2002 primary, and what remedies, if any, are available to him.